# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 38935**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Kenrick J. DOUGLAS**
Senior Airman (E-4), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 15 June 2017

———————————

*Military Judge:* Christopher M. Schumann (arraignment); Wendy L. Sherman.

*Approved sentence:* Bad-conduct discharge, confinement for 7 months, and reduction to E-1. Sentence adjudged 15 July 2015 by GCM convened at Cannon Air Force Base, New Mexico.

*For Appellant:* Captain Patricia Encarnación-Miranda, USAF.

*For Appellee:* Major Cara J. Condit, USAF; Major Amanda L.K. Linares, USAF; Major Meredith L. Steer, USAF; Gerald R. Bruce, Esquire.

Before MAYBERRY, HARDING, and C. BROWN, *Appellate Military Judges.*

Judge C. BROWN delivered the opinion of the court, in which Senior Judge MAYBERRY and Judge HARDING joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

———————————

C. BROWN, Judge:

A general court-martial consisting of officer members convicted Appellant, contrary to his pleas, of one specification of conspiracy to commit aggravated

assault with a dangerous weapon, three specifications of aggravated assault with a dangerous weapon,[1] and one specification of negligent discharge of a firearm, in violation of Articles 81, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 928, 934. The members acquitted Appellant of one specification of attempted murder and one specification of conspiracy to commit robbery, in violation of Articles 80 and 81, UCMJ, 10 U.S.C. §§ 880, 881. The members sentenced Appellant to a bad-conduct discharge, confinement for seven months, reduction to E-1, and a reprimand. The convening authority disapproved the reprimand, but otherwise approved the adjudged sentence.

On appeal, Appellant raises the following assignments of error: (1) the evidence is factually insufficient to sustain his negligent discharge of a firearm conviction; (2) the evidence is factually insufficient to sustain his remaining convictions;[2] (3) the offense of aggravated assault with a dangerous weapon by offer as a lesser included offense (LIO) of attempted robbery under Specification 3 of Charge I is unconstitutionally multiplicious with the offense of aggravated assault with a dangerous weapon under Charge III; (4) the convening authority improperly applied Article 25, UCMJ, 10 U.S.C. § 825, when he selected the panel members for Appellant's court-martial; (5) the military judge erred by failing to dismiss the case despite violations of Appellant's due process, Rule for Courts-Martial (R.C.M.) 703, and Article 46, UCMJ, 10 U.S.C. § 846, rights; (6) plain error occurred during the findings argument when trial counsel argued hearsay improperly;[3] and (7) the reasonable doubt instruction the military judge gave to the members was erroneous.[4] Finding

---

[1] In Specifications 2 and 3 of Charge I, the members acquitted Appellant of the greater offense of attempted robbery in violation of Article 80, UCMJ, but found him guilty of the lesser included offense (LIO) of assault with a dangerous weapon in violation of Article 128, UCMJ. The military judge also dismissed Specification 2 of Charge III alleging assault with a dangerous weapon in violation of Article 128, UCMJ, after finding it to be an LIO of Specification 2 of Charge I, attempted robbery, in violation of Article 80, UCMJ.

[2] Raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[3] Raised pursuant to *Grostefon*, 12 M.J. 431. Having considered Appellant's arguments, we summarily reject them as they do not require additional analysis or warrant relief. *See United States v. Matias*, 25 M.J. 356 (C.M.A. 1987).

[4] Raised pursuant to *Grostefon*, 12 M.J. 431. Appellant did not object to this instruction at trial. We thus summarily reject this assignment of error pursuant to *United States v. McClour*, 76 M.J. 23 (C.A.A.F. 2017) (finding no plain error where a military judge provided the same instruction without defense objection).

no error that prejudiced a material right of Appellant, we affirm the findings and sentence.

## I. BACKGROUND

Appellant, his close friend JJ, and Appellant's then-girlfriend JR attended a series of parties at private residences in Clovis, New Mexico, over the course of New Year's Eve, 31 December 2012, into early morning New Year's Day, 1 January 2013. At the last party the group attended, JR and another woman got into an altercation and JR was asked to leave the party by RR. JR, not wanting to leave, then got into an argument with RR on the porch of the house. In the presence of Appellant and JJ, RR told Appellant to "come get your bitch before she starts more problems." Appellant told RR not to refer to JR as a "bitch." RR replied that "[s]he's not even your girl, she's f*cking my best friend," referring to TF. TF and HG, who were also leaving the party, overheard RR comment that his "homey [TF]" had sex with JR.

TF got into a car with HG and they drove off together. Shortly thereafter, HG noticed a gray or white car following them, so he pulled over and both HG and TF got out of the car. At this point, two individuals approached them from the other car. The individuals were wearing "hoodies" and had their faces partially obscured by bandanas. Both individuals were carrying handguns which they pointed at TF and HG. One individual, later identified as JJ, said "give us your wallets and cell phones." The other individual, later identified as Appellant, pointed his weapon at TF and HG while asking them, which one of you is ["T"]? TF replied he was ["T."] Appellant then pointed his gun at TF and asked, "did you f*ck my girl?" TF answered "so this is what it's really about," and JJ hit TF in the head with his gun causing the gun to discharge. Appellant then also struck TF in the head with his gun and the gun discharged. Appellant again asked TF if he had "f*cked his girl." TF then "made a move" to get Appellant's gun, the gun discharged, and TF sustained a gunshot to his arm. TF placed his injured arm behind his back and said, "Nah man, I didn't f*ck your girl." Appellant replied "that's all I need to know" and he and JJ returned to their vehicle and drove off. While the altercation was occurring, both TF and HG noticed JR was present at the scene.

HG drove TF to the hospital where they both were interviewed by the Clovis Police Department. The Clovis Police department recovered one shell casing from the scene of the shooting and a ballistics expert identified the shell as being shot from JJ's "Glock" handgun. Appellant and JR both testified they left the party with JJ and went straight to the on-base residence of JJ's girlfriend, Senior Airman (SrA) KF.

## II. DISCUSSION

### A. Factual Sufficiency

We review issues of factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Our assessment of factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993).

When evaluating factual sufficiency, the test is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

### 1. Factual Sufficiency for Negligent Discharge of a Firearm

Using similar arguments to those made at trial, Appellant asserts the evidence is factually insufficient to support his conviction for negligent discharge of a firearm. Appellant claims the victims' identification of him and JJ as assailants was the result of suggestion by law enforcement, there was no evidence that his gun was fired at the scene of the shooting, no witness actually identified Appellant at the scene, and the Government presented scant evidence concerning the service discrediting element of the offense.

To sustain a conviction for this offense, the Prosecution was required to prove: (1) that Appellant discharged a firearm; (2) that such discharge was caused by Appellant's negligence; and (3) that, under the circumstances, Appellant's conduct was of a nature to bring discredit upon the armed forces. *Manual for Courts-Martial, United States* (*MCM*), pt. IV, ¶ 80b (2012).

The evidence supporting the conviction came from the testimony of TF and HG, who testified that both Appellant and JJ were carrying handguns when they attempted to rob TF and HG and both Appellant and JJ hit TF with their guns at different times during the incident. Each time Appellant and JJ "pistol whipped" TF, their guns discharged. While neither victim testified they were "100 percent" sure Appellant was one of the individuals who hit TF in the head with a handgun causing the gun to discharge, HG identified JR at the party and at the shooting scene, heard the offensive remark made by RR to JR at the party, saw Appellant and JJ with JR when the remark was made, and identified the car Appellant was driving. HG further explained how JR's presence at the scene confirmed it was Appellant and JJ

who followed them from the party and assaulted TF after asking him about having sex with JR. HG detailed Appellant and JJ pointing handguns at him and TF, JJ asking them for their wallets, and both men striking TF in the head with their pistols with the pistols discharging each time.

Similarly, TF testified that the men pointed their weapons at him and HG, asked for their wallets, and both men, the "Hispanic and black man" hit him in the head with their pistols causing the guns to discharge each time. TF stated that once he was asked about having sex with JR and saw JR at the scene, he immediately put two and two together to identify Appellant as the person who pistol whipped and shot him. TF stated he knew JR through his sister and had seen her at the party with Appellant and a "Hispanic gentleman."

The victim's testimony was supported by RR who detailed his interaction with JR at the party and described the statement he made about JR having sex with TF. The statement was made in the presence of Appellant and JJ with HG and TF standing in close proximity. Appellant confirmed he drove a vehicle of a similar color and size as the one described by the victims. He also testified he owned a Glock handgun which he signed out of the base armory prior to New Year's evening and returned to the armory the day after the alleged shooting. Both Appellant's and JJ's Glock handguns were seized from the armory and introduced at trial. Ballistics testing confirmed a shell found at the shooting scene was fired from JJ's handgun.

Finally, Ms. RC, who lived near the shooting site, testified that she heard three to five shots fired in the early morning of 1 January 2013, and that if an Air Force member was negligently firing a weapon on a residential street it would negatively impact her view of the Air Force.

The evidence presented at trial met all of the elements of the offense. Regarding the service discrediting element, there is no requirement that the Government show actual damage to the reputation of the military. *United States v. Mead*, 63 M.J. 724, 728 (A.F. Ct. Crim. App. 2006); *cf. United States v. Hartwig*, 39 M.J. 125, 130 (C.M.A. 1994) (holding that in the context of Article 133, UCMJ, 10 U.S.C. § 933, the prosecution need not prove actual damage to the reputation of the military). Rather, the test is whether Appellant's offense had a "tendency" to bring discredit upon the service. *United States v. Saunders*, 59 M.J. 1, 11 (C.A.A.F. 2003); *Hartwig,* 39 M.J. at 130. The trier of fact must determine beyond a reasonable doubt that the conduct alleged actually occurred and must also evaluate the nature of the conduct and determine beyond a reasonable doubt that Appellant's conduct would tend to bring the service into disrepute. *See Saunders*, 59 M.J. at 11. In this case, there is no doubt Appellant's conduct had a "tendency" to bring discredit upon the service. Having reviewed the entire record of trial and making allowances for

not personally observing the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

### 2. Factual Sufficiency for Remaining Offenses

Appellant, pursuant to *Grostefon*, 12 M.J. 431, also challenges the factual sufficiency of his remaining convictions: assault of TF and HG with a dangerous weapon by offer when Appellant pointed his gun at each prior to JJ asking the victims for their wallets; assault with a dangerous weapon by striking TF in the head with a loaded firearm; and conspiracy to commit aggravated assault against HG. The evidence supporting these convictions came from the testimony of TF and HG. Their testimony was supported by other witness testimony and both documentary and physical evidence as detailed above. For the aggravated assault convictions, no further analysis is required: the evidence presented at trial met all of the elements and, having reviewed the entire record of trial and making allowances for not personally observing the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

Regarding the final specification—conspiracy with JJ to commit aggravated assault—to sustain a conviction for this offense, the Prosecution was required to prove: (1) that Appellant entered into an agreement with JJ to commit aggravated assault, an offense under the UCMJ; and (2) that, while the agreement continued to exist, and while Appellant remained a party to the agreement, Appellant performed the overt act alleged, that is, Appellant pointed a loaded firearm at HG, for the purpose of bringing about the object of the agreement.

The elements of aggravated assault with a dangerous weapon are as follows: (1) that Appellant attempted or offered to do bodily harm to HG; (2) that Appellant did so with a certain weapon by pointing a loaded firearm at HG; (3) that the attempt or offer was done with unlawful force or violence; (4) that the weapon was used in a manner likely to produce death or grievous bodily harm; and (5) that the weapon was a loaded firearm. *MCM*, pt. IV, ¶ 54b(4)(a).

The military judge also correctly advised the members that:

> proof that the offense of aggravated assault actually occurred is not required. However, it must be proved beyond a reasonable doubt that the agreement included every element of the offense of aggravated assault. The agreement in a conspiracy does not have to be in any particular form or expressed in formal words. It is sufficient if the minds of the parties reach a common understanding to accomplish the object of the conspiracy, and this may be proved by the conduct of the parties. The agreement

> does not have to express the manner in which the conspiracy is to be carried out or what part each conspirator is to play.

While the Government did not present direct evidence of an agreement between Appellant and JJ to commit aggravated assault, it used the previously-mentioned testimony as circumstantial evidence of the required agreement and that it remained in place at the time Appellant pointed his weapon at HG. Both victims testified that they were followed by a vehicle and that when the vehicle stopped, two men, later identified as Appellant and JJ, got out wearing bandanas and hoodies. The men acted in concert, brandishing firearms at the victims and eventually pistol whipping and shooting TF. The short temporal proximity between the comment being made to JR at the party and the assault coupled with evidence that Appellant and JJ dressed alike and acted in tandem during the assault provided strong circumstantial evidence that Appellant and JJ had made an agreement that remained in effect to assault HG with a dangerous weapon. Having reviewed the entire record of trial and making allowances for not personally observing the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

## B. Multiplicity

In Specification 3 of Charge I, Appellant was charged with attempted robbery of TF, in violation of Article 80, UCMJ. Appellant was acquitted of attempted robbery, but found guilty of the LIO of aggravated assault with a dangerous weapon by offer, by putting TF in fear with a firearm. The members also found Appellant guilty of aggravated assault with a dangerous weapon in Specification 1 of Charge III for striking TF in the head with a loaded firearm.

On appeal, Appellant for the first time contends his conviction for the LIO in Specification 3 of Charge I is unconstitutionally multiplicious with Charge III. He asserts the evidence presented demonstrates he could not have struck TF with the gun without first pointing it at him. We disagree.

We review multiplicity issues de novo. *United States v. Anderson*, 68 M.J. 378, 385 (C.A.A.F. 2010); *United States v. Roderick*, 62 M.J. 425, 431 (C.A.A.F. 2006). When not objected to at trial, an appellant is only entitled to relief if the specifications are facially duplicative. *United States v. Lloyd*, 46 M.J. 19, 20 (C.A.A.F. 1997). Whether two offenses are facially duplicative is a question of law that is reviewed de novo. *United States v. Pauling,* 60 M.J. 91, 94 (C.A.A.F. 2004). Two offenses are not facially duplicative if each "requires proof of a fact which the other does not." *United States v. Hudson,* 59 M.J. 357, 359 (C.A.A.F. 2004) (quoting *Blockburger v. United States,* 284 U.S. 299, 304 (1932)). Rather than constituting "a literal application of the elements test," determining whether two specifications are facially duplicative involves

a realistic comparison of the two offenses to determine whether one is rationally derivative of the other. *Hudson*, 59 M.J. at 359 (citing *United States v. Foster,* 40 M.J. 140, 146 (C.M.A. 1994)).

Each of these assault specifications deals with factually different acts. The LIO of Specification 3, Charge I addresses Appellant's conduct in pointing a loaded gun at TF prior to JJ asking TF and HG for their wallets; Charge III addresses Appellant's conduct in later striking TF in the head with a loaded firearm when asking if TF had slept with Appellant's girlfriend. Since each of the offenses requires the proof of a fact that the other does not, i.e., the LIO requires proof that Appellant pointed his weapon at TF and Charge III requires proof that Appellant struck TF on the head with a loaded firearm, the charges are not facially duplicative. *Hudson*, 59 M.J. at 359.

**C. Panel Member Selection**

During the referral process, the convening authority was presented 16 members to consider for service on Appellant's general court-martial. Of the 16 members, one was African American. The convening authority ultimately selected 12 officers for service on Appellant's court: 10 Caucasian, one Asian-American, and one Caucasian of Hispanic descent. After receiving the final convening order, trial defense counsel sent a memorandum to the convening on behalf of Appellant, who is African American, and requested the convening authority select a "diverse" panel. Despite the written request, the convening authority did not change the composition of the panel. At trial, defense counsel made a motion for a "diverse" panel, the Government did not formally respond, but instead noted there were no changes to the selected panel, and the military judge denied the motion. Appellant now asserts the military judge abused her discretion by incorrectly applying the law to defense counsel's motion. Appellant avers that his counsel made a prima facie case of discrimination and thus the burden should have shifted to the Government to present evidence explaining the exclusion of a complete class of eligible members. *United States v. Gooch*, 69 M.J. 353, 359 (C.A.A.F. 2011); *United States v. Santiago-Davila*, 26 M.J. 380, 391-392 (C.M.A. 1988). In light of the alleged error, Appellant asks this court to remand his case for a new trial.

Whether a panel is properly selected is a question of law we review de novo. *United States v. Dowty*, 60 M.J. 163, 171 (C.A.A.F. 2004). The defense shoulders the initial burden of establishing the improper exclusion of qualified personnel from the selection process. *United States v. Roland,* 50 M.J. 66, 69 (C.A.A.F. 1999). Once the defense establishes such exclusion, the government must show by competent evidence that no impropriety occurred when selecting Appellant's court-martial members. *United States v. Kirkland*, 53

8

M.J. 22 (C.A.A.F. 2000). We are bound by the military judge's findings of fact unless they are clearly erroneous. *Dowty*, 60 M.J. at 171.

As a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair and impartial panel. *United States v. Downing,* 56 M.J. 419, 421 (C.A.A.F. 2002) (quoting *United States v. Wiesen,* 56 M.J. 172, 174 (C.A.A.F. 2001)). These rights are upheld through application of selection criteria contained in Article 25, UCMJ, as well as the use of peremptory and causal challenges during voir dire. *Gooch*, 69 M.J. at 357.

Pursuant to Article 25(d)(2), UCMJ, when convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, in his or her opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament.

The operation of Article 25, UCMJ, is further informed by case law. As a starting point, three principles should inform the screening of service members for court-martial service: (1) we will not tolerate an improper motive to pack the member pool; (2) systemic exclusion of otherwise qualified potential members based on an impermissible variable such as rank, race, or gender is improper; and (3) this court will be deferential to good faith attempts to be inclusive and to require representativeness so that court-martial service is open to all segments of the military community. *Dowty*, 60 M.J. at 171. The legality of the exclusion of a specific group from courts-martial hinges on the presence or absence of specific intent. *United States v. McClain,* 22 M.J. 124, 130 (C.M.A. 1986) (citing *Castaneda v. Partida*, 430 U.S. 482 (1977)). Military appellate courts have long held that discrimination in the selection of court members on the basis of improper criteria threatens the integrity of the military justice system. *McClain*, 22 M.J. at 132 (citing *United States v. Daigle*, 1 M.J. 139, 140 (C.M.A. 1975)).

Exclusion of members on the grounds of race has long been considered improper in the selection of court-members. *See United States v. Crawford*, 35 C.M.R. 3, 13 (C.M.A. 1964). However, a military accused does not have a "per se" right to a cross-sectional representation of the military community on his panel. *See Duren v. Missouri*, 439 U.S. 357 (1979). Neither the Constitution of the United States nor the UCMJ requires that every economic, racial, or ethnic class, or persons of all military grades be appointed to a military jury. On the contrary, the law provides only that significant and identifiable groups may not be systematically excluded from the jury selection process. *United States v. Credit*, 2 M.J. 631, 638 (A.F.C.M.R. 1976), *rev'd on other grounds* (citing *Swain v. Alabama*, 380 U.S. 202 (1965); *Crawford*, 35 C.M.R. 3)).

Here, the record shows an absence of evidence of purposeful discrimination on the part of the convening authority. Trial defense counsel attempted to demonstrate discriminatory practices by asserting:

> The convening authority was given 16 data sheets of people who were available and qualified to serve on this court-martial panel. One of those individuals was African American out of the 16 that were submitted. And he was not selected. We don't know why, but we feel like more African Americans should have been given an opportunity to serve. I'll also just note that while the government, for whatever reason, did not choose to submit any more African Americans to the convening authority, they did choose to submit the security forces commander on this base as a qualified member to serve on this panel. So, that being said, we just do not feel like the African American officers at this base haven't [sic] been given the opportunity to serve. And had they been given to the convening authority for his selection, it's more likely that he would have been able to select an African American, at least one, to serve on this panel.

In her ruling on the motion, the military judge noted that Article 25, UCMJ, requires a convening authority to detail members "who are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." She also found there was "no evidence the convening authority had systematically excluded members of race." She further found no indication that the exclusion of sole African American nominee was not based upon Article 25 criteria as opposed to "some other untoward motive." We find no abuse of discretion in the military judge's findings of fact or application of law. The Appellant has not made a *prima facie* case of discrimination; thus, we decline to grant relief.

**D. Alleged Due Process Violations**

Appellant asserts the military judge erred by failing to dismiss his case as a result of violations of his constitutional due process, R.C.M. 703 and Article 46, UCMJ rights. Appellant alleges that delay in the law enforcement investigation, loss of or failure to preserve evidence, and the lack of equal access of evidence prejudiced him at trial, depriving him of the possibility of receiving a fair trial. We disagree.

This court reviews a military judge's ruling on a motion to dismiss for an abuse of discretion. *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004). An abuse of discretion occurs when a court's findings of fact are clearly erroneous or the decision is influenced by an erroneous view of the law. *United States v. Lubich*, 72 M.J. 170, 173 (C.A.A.F. 2013). "The abuse of discretion

standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (internal citations and quotations omitted).

Article 46(a), UCMJ, provides: "The counsel for the Government, the counsel for the accused, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe."

To establish a violation of Article 46 due to lost or destroyed evidence, an accused must satisfy the test announced in *California v. Trombetta*, 467 U.S. 479 (1984). *See United States v. Kern*, 22 M.J. 49, 51 (C.M.A. 1986) (noting the *Trombetta* test satisfies both constitutional and military standards of due process and is applicable to trial by courts-martial). The test articulated in *Trombetta*, and further refined in *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), provides that the destruction of, or failure to preserve, potentially exculpatory evidence does not entitle an accused to relief on due process grounds unless: (1) the evidence possesses an exculpatory value that was apparent before it was destroyed; (2) it is of such a nature that the accused would be unable to obtain comparable evidence by other reasonably available means; and (3) the Government acted in bad faith when it lost or destroyed such evidence. *United States v. Terry*, 66 M.J. 514, 517 (A.F. Ct. Crim. App. 2008). If "material exculpatory evidence" is lost, as opposed to merely "potentially useful" evidence, the requirement to demonstrate that the Government acted in bad faith does not apply. *Illinois v. Fisher*, 540 U.S. 544, 547–48 (2004).

R.C.M. 703(f)(1) states: "Each party is entitled to the production of evidence which is relevant and necessary." R.C.M. 703(f)(2) states that despite the broad rule in R.C.M. 703(f)(1), "a party is not entitled to the production of evidence which is destroyed, lost, or otherwise not subject to compulsory process." However, it continues, if such evidence is of such central importance to an issue that it is essential to a fair trial, and if there is no adequate substitute for such evidence, the military judge shall grant a continuance or other relief in order to attempt to produce the evidence or shall abate the proceedings, unless the unavailability of the evidence is the fault of or could have been prevented by the requesting party. R.C.M. 703(f)(2) does not require the accused to demonstrate bad faith on the part of the Government, something an accused may have to demonstrate to obtain relief under Article 46, UCMJ, or the Constitution. *Terry,* 66 M.J. at 518. R.C.M. 703 therefore represents "the President going even further than the Constitution and the Uniform Code in providing a safeguard for military personnel." *United States v. Manuel*, 43 M.J. 282, 288 (C.A.A.F. 1995).

The Fifth Amendment[5] provides that "no person shall be deprived of life, liberty, or property, without Due Process of law." The Fifth Amendment Due Process Clause affords criminal defendants, among other rights, protection against egregious trial delays. *United States v. Lovasco*, 431 U.S. 783 (1977); *United States v. Vogan*, 35 M.J. 32, 34 (C.M.A. 1992). The Court of Appeals for the Armed Forces applies a two-prong test for determining whether delays constitute a Fifth Amendment violation. First, Appellant must show prejudice, e.g., "the actual loss of a witness, as well as the substance of their testimony," or the loss of physical evidence; and second, there must be "proof to show an egregious or intentional, tactical delay." *United States v. Reed*, 41 M.J. 449, 452 (C.A.A.F. 2000) (citing *United States v. Tousant*, 619 F.2d 810, 814 (9th Cir. 1980); *United States v. Dennis*, 625 F.2d 782, 794 (8th Cir. 1980); *United States v. Comosona*, 614 F.2d 695, 697 (10th Cir. 1980)). The Due Process Clause also requires that law enforcement preserve potentially useful evidence. However, in order to prevail on a Due Process claim, a criminal defendant must show the failure to preserve was the result of bad faith.

Prior to ruling on the Defense motion to dismiss, the military judge made detailed findings of fact and individually addressed each piece of evidence the defense contested. Appellant alleges law enforcement failed to promptly interview witness, to take necessary crime scene photos, to obtain social media evidence from TF's mother, to preserve evidence from the crime scene for potential DNA testing, to take adequate photographs of TF's injuries, and did not record one of their interviews with JR. Appellant does not argue the military judge's findings concerning the evidence were erroneous. Instead, he continues to allege the delay in the investigation affected the witnesses' memories significantly and claims the Government's failure to preserve or obtain evidence coupled with the law enforcement's failure to preserve the witnesses' memories deprived him of challenging the witnesses' testimony at trial. However, as the military judge noted in her findings, the witnesses were interviewed by local law enforcement on the night of the shooting and re-interviewed by Air Force Office of Special Investigations personnel eight months later after the Air Force obtained jurisdiction in the case. More importantly, Appellant has failed to demonstrate the "unavailable evidence" was exculpatory or that its unavailability was caused by bad faith on the part of the Government, a necessity for him to prevail under Article 46 or the Due Process Clause. At trial, defense counsel conceded any lost evidence was not due to intentional misconduct or bad faith on the part of authorities. Appel-

---

[5] U.S. CONST. amend. V.

lant's repeated claims of "sloppy police work" do not equate to a showing of bad faith.

Turning to an analysis under R.C.M. 703(f)(2), the Defense similarly fails to articulate any apparent exculpatory value for the alleged unavailable evidence. Specifically, Appellant asserts the lack of DNA testing of the gun Appellant allegedly struck TF in the head with made it impossible for him to have a fair trial as he was prevented from arguing the absence of DNA to show TF was never hit with the gun. Appellant's argument assumes the blow to TF's head would leave DNA on the weapon and his counsel conceded at trial that this evidence was not necessarily exculpatory.

Appellant makes similar arguments concerning the necessity of crime scene photos, arguing they are required to show the officers were at the correct crime scene and to eliminate the possibility that the victims were assaulted at a different location. This argument ignores the victim's consistent description of where the assault took place and once again fails to show how the evidence would be exculpatory as opposed to inculpatory. Appellant makes like claims about the failure of law enforcement to collect HG's clothing on the night of the shooting so the clothes could be examined for blood, the failure of law enforcement to preserve texts from TF's mother who attempted to find her son's assailant using social media, and the absence of photos of TF's head to show injuries from the assault or powder burns from the gun discharging near his head. In each case, defense counsel asserted the possible relevance of the evidence, at times arguing the evidence was potential impeachment material, while also arguing it was "possibly" exculpatory. However, the defense counsel failed to show that any piece of evidence they lacked was truly exculpatory or essential to a fair trial. We find no abuse of discretion in the military judge's denial of the defense motion to dismiss based on the Due Process Clause, Article 46, or R.C.M. 703 violations.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the findings and the sentence are **AFFIRMED.**[6]

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court

---

[6] We note both the Report of Result of Trial and Court-Martial Order (CMO) fail to reflect Appellant's plea of not guilty to Specification 2 of Charge III, for assault with a dangerous weapon in violation of Article 128, UCMJ, and the military judge's subsequent dismissal of this specification prior to panel deliberations because it was an LIO of Specification 2 of Charge I, attempted robbery, in violation of Article 80, UCMJ. Appellant was not prejudiced by this oversight; however, we direct promulgation of a new CMO to accurately reflect the pleas and later dismissal of this specification.